Case No. 20-16900

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

DANIEL BERMAN, et al.

Plaintiffs – Appellees,

v.

FREEDOM FINANCIAL NETWORK, LLC, et al.

Defendants – Appellants.

_____

On Appeal From
United States District Court for the Northern District of California
Case No. 4:18-cv-01060-YGR
Honorable Yvonne Gonzalez Rogers

_____

**PLAINTIFFS-APPELLEES' ANSWERING BRIEF**

_____

Beth E. Terrell
Jennifer Rust Murray
Amanda M. Steiner
TERRELL MARSHALL LAW
GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603

Anthony I. Paronich,
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
Telephone: (617) 738-7080

*Attorneys for Plaintiffs-Appellees*

# **TABLE OF CONTENTS**

**Page No.**

I.     INTRODUCTION ...................................................................................1

II.    STATEMENT OF ISSUES .......................................................................5

III.   JURISDICTION ......................................................................................6

IV.    STATEMENT OF THE CASE ..................................................................6

       A.     Freedom hired Fluent to make robocalls promoting its debt relief
              services but halted the telemarketing campaign after hundreds of
              thousands of requests to stop the calls and texts ..............................6

       B.     Ms. Russell and Ms. Hernandez did not agree to arbitrate .............10

              1.     Ms. Russell did not agree to arbitrate ...................................10

              2.     Ms. Hernandez did not agree to arbitrate.............................11

       C.     The district court denied Defendants' motion to compel
              arbitration of Ms. Russell's and Ms. Hernandez's claims ..............12

       D.     The district court denied Defendants' motion for
              reconsideration ...............................................................................14

V.     SUMMARY OF THE ARGUMENT ........................................................16

VI.    ARGUMENT..........................................................................................19

       A.     The district court correctly found there was no agreement
              to arbitrate........................................................................................20

              1.     The design and content of Fluent's webpages did not put a
                     reasonably prudent user on inquiry notice of the
                     arbitration provision.............................................................21

a. The recreated webpages Fluent claims
Ms. Russell visited did not provide reasonably
conspicuous notice of the arbitration provision ........24

b. The recreated webpage that Fluent claims
Ms. Hernandez visited did not provide reasonably
conspicuous notice of the arbitration provision .........28

2. The district court correctly considered the content and
design of Fluent's webpages in their entirety rather than
plucking out isolated elements as Defendants advocate.......30

3. The district court did not err in finding in the alternative
that there were material disputed facts .................................38

B. The district court did not abuse its discretion in denying
Defendants' motion for reconsideration..........................................43

C. Even if there is an agreement to arbitrate, neither Freedom
nor Drips may compel arbitration ..................................................51

VII. CONCLUSION...........................................................................................58

## <u>TABLE OF AUTHORITIES</u>

**Page**

### CASES

*Amisil Holdings Ltd. v. Clarium Capital Mgmt. LLC*,
    622 F. Supp. 2d 825 (N.D. Cal. 2007)......................................................58

*Anand v. Heath,*
    19-cv-0016-JJT, 2019 WL 2716213 (N.D. Ill. June 28, 2019) .......... 27, 28

*Beattie v. TTEC Healthcare Solutions, Inc.*,
    No. 1:18-cv-01574-RM-SKC,
    2019 WL 2189481 (D. Colo. May 21, 2019) ...........................................41

*Britton v. Co-op Banking Group*,
    4 F.3d 742 (9th Cir. 1993) ........................................................................58

*Castro v. ABM Indus., Inc.*,
    325 F.R.D. 332 (N.D. Cal. 2018) .............................................................52

*City of Emeryville v. Robinson*,
    621 F.3d 1251 (9th Cir. 2010) ..................................................................52

*Comedy Club, Inc. v. Improv W. Assocs.*,
    553 F.3d 1277 (9th Cir. 2009) ..................................................................52

*Crawford v. Beachbody, LLC*,
    No. 14-cv-1583-GPC, 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014)........27

*Cullinane v. Uber Techs., Inc.*,
    893 F.3d 53 (1st Cir. 2018).......................................................................22

*Dohrmann v. Intuit, Inc.*,
    823 F. App'x 482 (9th Cir. 2020)....................................................... 36, 37

*Estate of Saunders v. C.I.R.*,
    745 F.3d 953 (9th Cir. 2014))...................................................................52

*Feld v. Postmates, Inc.*,
    442 F. Supp. 3d 825 (S.D.N.Y. 2020) .....................................................37

*Garcia v. Enterprise Holdings, Inc.*,
    78 F. Supp. 3d 1125 (N.D. Cal. 2015)........................................................35

*Goldman v. KPMG LLP*,
    92 Cal. Rptr. 3d 534 (Cal. Ct. App. 2009).................................... 53, 54, 56

*Goldman, Sachs & Co. v. City of Reno*,
    747 F.3d 733 (9th Cir. 2014) .....................................................................19

*Gonzalez-Torres v. Zumper, Inc.*,
    No. 4:19-cv-02183-PJH (N.D. Cal. July 25, 2019) ...................................41

*Graf v. Match.com, LLC*,
    No. CV-15-3911-PA,
    2015 WL 4263957 (C.D. Cal. July 10, 2015) ................................... 26, 27

*In re Henson*,
    869 F.3d 1052 (9th Cir. 2017) .......................................................... 53, 55

*In re Pac. Fertility Ctr. Litig.*,
    814 F. App'x 206 (9th Cir. 2020).............................................................53

*Ioane v. MRS BPO, LLC*,
    484 F. Supp. 3d 888 (D. Haw. Sept. 4, 2020) .........................................55

*Knepper v. Ogletree*,
    No. 8:19-cv-00060-JVS-ADS,
    2019 WL 1449502 (C.D. Cal. Mar. 26, 2019) .........................................40

*Kona Enter., Inc. v. Estate of Bishop*,
    229 F.3d 877 (9th Cir. 2000))............................................................ 43, 44

*Kramer v. Toyota Motor Corp.*,
    705 F.3d 1122 (9th Cir. 2013) .......................................................... 53, 56

*Lee v. Ticketmaster L.L.C.*,
    817 F. App'x 393 (9th Cir. 2020).............................................................26

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) ......................................................... 36, 37, 43

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*,
   460 U.S. 1 (1983) ..........................................................................................19

*Murphy v. DirecTV, Inc.*,
   724 F.3d 1218 (9th Cir. 2013) ................................................... 53, 56, 57

*Mundi v. Union Sec. Life Ins. Co.*,
   555 F.3d 1042 (9th Cir. 2009) ....................................................................52

*Namisnak v. Uber Techs., Inc.*,
   971 F.3d 1088 (9th Cir. 2020) ....................................................................55

*Nevarez v. Forty Niners Football Co., LLC*,
   No. 16-CV-07013,
   2017 WL 3492110 (N.D. Cal. Aug. 15, 2017) .........................................26

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) .......................................................... *passim*

*Nicosia v. Amazon.com, Inc.*,
   384 F. Supp. 3d 254 (E.D.N.Y. 2019)
   *aff'd*, 815 F. App'x 612 (2d Cir. 2020) ....................................... 31, 35, 51

*PDC Labs., Inc. v. Hach Co.*,
   No. 09-1110, 2009 WL 2605270 (C.D. Ill. Aug. 25, 2009) .....................35

*Peter v. DoorDash, Inc.*,
   445 F. Supp. 3d 580 (N.D. Cal. 2020) ......................................................37

*Rahmany v. T-Mobile USA Inc.*,
   717 F. App'x 752 (9th Cir. 2018) ................................................. 18, 54, 55

*Rajagopalan v. NoteWorld, LLC*,
   718 F.3d 844 (9th Cir. 2013) ....................................................................55

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) ....................................................... 32, 33, 50

*Rodriguez v. Experian Serv. Corp.*,
   No. CV-15-3553-R, 2015 WL 12656919 (C.D. Cal. Oct. 5, 2015) ..........26

*Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*,
  993 F.3d 253 (4th Cir. 2021) ....................................................................19

*Scherk v. Alberto-Culver Co.*,
  417 U.S. 506 (1974)..................................................................................19

*School Dist. No. 1J v. ACandS, Inc.*,
  5 F.3d 1255 (9th Cir. 1993) ....................................................................44

*Sgouros v. TransUnion Corp.*,
  817 F.3d 1029 (7th Cir. 2016) ................................................................20

*Simpson v. Pulte Home Corp.*,
  No. C 11-5376 SBA, 2012 WL 1604840 (N.D. Cal. May 7, 2012)..........56

*Snow v. Eventbrite, Inc*.,
  No. 3:20-cv-03698-WHO,
  2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) ................................... 34, 35

*Spano v. V & J Nat'l Enters., LLC*,
  264 F. Supp. 3d 440 (W.D.N.Y. 2017).....................................................57

*Specht v. Netscape Commc'ns Corp.*,
  306 F.3d 17 (2d Cir. 2002) ............................................................... 21, 22

*Sw. Airlines Co. v. Boardfirst, L.L.C.*,
  No. 3:06-cv-0891-B,
  2007 WL 4823761 (N.D. Tex. Sept. 12, 2007) ........................................51

*Temple v. Best Rate Holdings LLC*,
  360 F. Supp. 3d 1289 (M.D. Fla. 2018) ............................................ 56, 57

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*,
  925 F.2d 1136 (9th Cir. 1991) .................................................... 18, 41, 43

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
  No. CV-997654–HLHVBKX,
  2003 WL 21406289 (C.D. Cal. Mar. 7, 2003) .........................................51

*Torbit, Inc. v. Datanyze, Inc.*,
    No. 5:12-cv-05889-EJD,
    2013 WL 572613 (N.D. Cal. Feb. 13, 2013) ............................................. 56

*Van Patten v. Vertical Fitness Group, LLC*,
    847 F.3d 1037 (9th Cir. 2017) ................................................................... 54

*Waymo v. Uber Techs., Inc.*,
    252 F. Supp. 3d 934 (N.D. Cal. 2017) ....................................................... 56

*Wilson v. Huuuge, Inc.*,
    944 F.3d 1212 (9th Cir. 2019) ........................................................ *passim*

## FEDERAL STATUTES

9 U.S.C. § 4 .............................................................................................. 19, 43

## I.  INTRODUCTION

Daniel Berman filed this lawsuit asserting violations of the Telephone Consumer Protection Act after receiving a spam text message and robocall marketing the services of Freedom Financial Network, LLC and Freedom Debt Relief, LLC (together "Freedom"). This telemarketing was part of a massive campaign carried out by Fluent, Inc. and Lead Science, LLC ("Drips") targeting people who had purportedly entered their contact information on one or more of Fluent's multitude of sweepstakes websites. In fact, many of the telephone numbers, including Plaintiff Berman's telephone number, were fictitious. More than 700,000 consumers told Fluent to stop calling and texting.

The district court denied Defendants' motion to compel arbitration of Plaintiff Berman's claim because of disputed issues of fact about whether he visited Fluent's website. Plaintiffs Stephanie Hernandez and Erica Russell did visit Fluent's websites before receiving spam text messages and robocalls marketing Freedom's services. When they joined the lawsuit, Defendants moved to compel arbitration of their claims based on webpages Fluent claimed to have "recreated" from information in its databases.

The district court denied Defendants' motion to compel arbitration of Ms. Russell's and Ms. Hernandez's claims, holding that the content and design of Fluent's recreated webpages did not conspicuously notify users that they were

agreeing to the Terms & Conditions containing the arbitration provision. Among other things, the webpages:

- did not include an affirmative means of indicating consent to the Terms & Conditions or arbitration provision;

- did not include text warning users that they will be deemed to have agreed to the Terms & Conditions by clicking a "Continue" or "This is correct Continue!" button;

- did not include text prompting users to take affirmative action to demonstrate assent; and

- did not include a tickbox or "I agree" button for the Terms & Conditions.

And although the user had to interact with the webpage to continue using it by pressing a "This is correct, Continue!" or "Continue" button, the buttons "plainly" referred to other information users had to enter or confirm on the page, like Terms & Conditions and reference to mandatory arbitration. The district court found in the alternative that there were material facts in dispute because Fluent submitted incomplete recreated webpages and Plaintiffs filed declarations disputing aspects of the recreated webpages.

Defendants moved for leave to file a motion for reconsideration, arguing that testimony from the depositions they took of Ms. Russell and Ms. Hernandez two

months earlier was material to the outcome of the motion. The district court denied the motion because Defendants had the testimony before the court's decision and failed to act with reasonable diligence and because Plaintiffs' testimony was not materially different than the facts the court considered.

Defendants appealed both the denial of their motion to compel arbitration and their motion for reconsideration. They ask the Court to reverse because they contend that placing a link in close proximity to a "Continue" button in black font is "incontrovertibly" sufficient to put a reasonable user on notice of terms and conditions under *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014). But this argument—and Defendants' attempt to bolster it with enlarged excerpts of portions of the recreated webpages—ignores this Court's consistent instruction in *Nguyen* and subsequent decisions that the enforceability of a browsewrap agreement to arbitrate must be evaluated by considering the overall design and content of a website. Fluent's webpages are cluttered and confusing, and designed to draw attention *away* from the Terms & Conditions hyperlink. And while the link may be near the "This is correct, Continue!" and "Continue" buttons, clicking the buttons is, as the district court observed, "completely divorced from an expression of assent to the Terms & Conditions or to mandatory arbitration." The district court followed this Court's guidance in finding that Fluent's webpages did not put a

reasonably prudent user on notice of the arbitration provision and its ruling should be affirmed.

Defendants also take issue with the district court's alternative finding that there are material facts in dispute, claiming that their recreated webpages are conclusive evidence of Plaintiffs' agreement to arbitrate. But this is not a case where plaintiffs merely say they cannot remember seeing an arbitration provision, as Defendants suggest. Plaintiffs recall visiting Fluent's websites but say the webpages looked different than Fluent's recreated versions. The available evidence corroborates Plaintiffs' recollections since the "Winner Claim Form" Defendants filed with their motion lists Ms. Russell's "prize" as the Walmart gift card she remembers seeing on the webpage and not the Target gift card that appears on Fluent's recreated webpage.

Finally, Defendants argue that the district court abused its discretion in denying their motion for reconsideration. They offer various conflicting excuses for not taking Plaintiffs' depositions sooner and then not providing the district court with the testimony before its ruling. None is persuasive. Defendants had months of opportunity to depose Plaintiffs both before filing their motion and while the parties extended the briefing schedule to allow Plaintiffs to take discovery. When Defendants finally did depose Plaintiffs, they opted to withhold

the testimony for two months until they lost their motion. It is not surprising that the district court viewed Defendants' delay as a "tactical decision."

The district court also found that Plaintiffs' deposition testimony was consistent with their declarations and thus would not have impacted the court's decision even if Defendants had acted diligently in taking the depositions and providing the testimony to the court. Moreover, Defendants conceded they had based their original motion on the theory that their webpages put a reasonably prudent user on inquiry notice of the arbitration provision but, after losing on that theory, shifted to an argument that Plaintiffs had actual notice of the arbitration provision in their motion for reconsideration. Not only was this new theory known to Defendants and thus not a basis for reconsideration, Plaintiffs' deposition testimony does not support it. For all these reasons, the district court did not abuse its discretion in denying Defendants' motion for leave to file a motion for reconsideration.

## II.   STATEMENT OF ISSUES

Whether the district court's denial of Defendants' motion to compel arbitration should be affirmed because the content and design of Fluent's recreated webpages did not put a reasonably prudent user on notice of the arbitration provision.

Whether the district court's denial of Defendants' motion to compel arbitration should be affirmed because Defendants' failure to provide the complete website "flows" and Plaintiffs' declarations disputing elements of Fluent's recreated webpages created disputed issues of material facts.

Whether the district court acted within its discretion in denying Defendants' motion for reconsideration because they could have provided Plaintiffs' deposition testimony to the court before its decision if they had acted with reasonable diligence and because the testimony did not establish a material difference in the facts underpinning the district court's order.

### III.    JURISDICTION

Plaintiffs agree with Defendants' jurisdictional statement.

### IV.    STATEMENT OF THE CASE

**A.    Freedom hired Fluent to make robocalls promoting its debt relief services but halted the telemarketing campaign after hundreds of thousands of requests to stop the calls and texts.**

Freedom sells debt relief services. 4-ER-751. Fluent is a digital marketing company that generates leads through websites that entice users with sweepstakes, job listings, free product samples, and other rewards like gift cards. 4-ER-749. Freedom hired Fluent to generate leads for telemarketing. 4-ER-751-752. To be eligible for the rewards, users must answer a series of survey questions and register their names and addresses. *Id.* Fluent uses third parties to drive web traffic to its

websites and pays them for users' visits to Fluent's websites, their completion of survey questions, and their entry of email addresses. *Id.*

The campaign began in May 2017 and ran through April 2018. 4-ER-752. Even though Plaintiff Daniel Berman added his cell phone number to the National Do Not Call Registry in 2003, Fluent sent 18 text messages and three prerecorded calls to Mr. Berman's cell phone during the campaign. *Id.* Fluent's records purport to show that Mr. Berman's cell phone number was registered on one of Fluent's websites on December 24, 2017 at 5:39:16 p.m. using a Samsung Galaxy J3 mobile phone at a coffee shop in Alameda, California. 4-ER-752. The registered name was "Dunk Loka" with an email address of Buffola@gmail.com. *Id*. Mr. Berman never visited a Fluent website, never provided any of the Defendants with his phone number, never used the registered email, and never consented to receive telemarketing texts or calls. 4-ER-752-753.

The lead lists that Fluent and Drips produced show that Mr. Berman was not alone. The lists have hundreds of thousands of entries with missing name and address data or obviously invalid information. 4-ER754. For example, a total of 10,323 entries have invalid first names like "{FIRSTNAME}" and 363,792 have invalid last names like "[BLANK]." *Id.*[1]

---

[1] Fraudulent website registrations appear to be central to Fluent's business model. *See* New York State Office of the Attorney General, Fake Comments: How U.S.

Individuals who did visit Fluent's websites before receiving texts and robocalls were enticed by the offers for sweepstakes entries, job listings, product samples, and other rewards. 4-ER-749. To register for the rewards, users had to enter their contact information and click a "Continue" (or "Enter to Win" or "Submit") button, often next to a checkbox stating "I AGREE to receive daily emails from InstantPlayGiveaway, LivingLargeSweeps, GivingTreeSweeps, and Major Sweeps." 4-ER-749-750, 1-ER-15-16. Near the button appeared a statement in tiny print similar to: "I understand and agree to email marketing, the <u>Terms & Conditions</u>, which include mandatory arbitration and <u>Privacy Policy</u>." 4-ER-749-50, 1-ER-15-16. Defendants contend that users consented to arbitration by clicking the "Continue" button.

Users were then shown a series of 15 or more survey questions to answer, like "do you own a home?" 4-ER-750. They were then sent to another webpage to "CONFIRM YOUR INFORMATION" with a form prepopulated with their name and contact information, a small print disclosure about consent to receive phone sales calls and text messages "from Verde Energy, CAC, and our Marketing Partners," a checkbox stating "I CONFIRM that all of my information is accurate and consent to be called and texted as provided above," and a large "Continue"

---

Companies & Partisans Hack Democracy to Undermine Your Voice at 13-16, 25-29 (May 6, 2021), https://ag.ny.gov/sites/default/files/oag-fakecommentsreport.pdf.

button. 4-ER-750-751. Fluent contends that users provided consent under the TCPA by clicking the "Continue" button on this final webpage. 4-ER-750.

Fluent's websites, however, are confusing and misleading and their disclosures fall far below industry standards and best practices in consumer web design. *See generally* SER-8-27. The website disclosures are buried in small font, use multi-screen bait and switch tactics, overload visitors with pages of distractions, bundle consent pages, and fail to clearly and conspicuously identify the seller on whose behalf the telemarketing would be done. SER-11-26 ¶¶ 12-68. Fluent's multi-step disclosure process is confusing (SER-11, 14-16 ¶¶ 15, 30-33) and its hyperlinked list of "marketing partners" runs over 400 names long. SER-17. None of those names is "Freedom Debt Relief," the defendant whose services were being telemarketed. *Id.*

Unsurprisingly, the campaign generated a flurry of complaints and opt outs. 4-ER-753. Many of the complaints were from people who said their prior do-not-call requests had been ignored. *Id.* About 28% of the numbers Fluent called during a two-month period of the campaign opted out. *Id.* Fluent knew "that a high percentage of the automated calls were ended before the called party ever spoke with a representative." *Id.*

Fluent placed 4,492,433 calls and text messages to 691,157 wireless numbers. SER--31 ¶ 14. Of those calls and texts, 462,607 were made to leads with

patently fictitious addresses and 777,692 to consumers who told Fluent to stop calling and texting. SER-7.

**B.   Ms. Russell and Ms. Hernandez did not agree to arbitrate.**

When Mr. Berman moved for class certification, the district court denied the motion without prejudice because Mr. Berman did not visit one of Fluent's websites before receiving unwanted texts and robocalls marketing Freedom's services and therefore could not satisfy the typicality and adequacy requirements for a proposed class that included people who did visit Fluent's websites. 4-ER-768. The district court granted Mr. Berman's motion for leave to file an amended complaint in January 2020 to add Ms. Russell and Ms. Hernandez as proposed representatives for class members who visited Fluent's websites before receiving unwanted texts and robocalls. Dkt. No. 219; *see* 4-ER-699-736.

1.   <u>Ms. Russell did not agree to arbitrate.</u>

Ms. Russell recalls visiting a Fluent website but not agreeing to—or seeing anything about—arbitration. She was looking online for coupons to save money for herself and her family. 4-ER-579. On her cell phone, she saw an ad that asked if she wanted to win a Walmart gift card. She clicked on it. That took her to a series of questions. 4-ER-579-580; *see also* 4-ER-683-686. Eventually, Ms. Russell typed her name, address, and email address into a form. 4-ER-579. The form concluded with a large green "Continue >>" button and tiny, washed-out text

referencing the Terms & Conditions, mandatory arbitration, and Privacy Policy. 4-ER-688. Defendants claim that by clicking on this "Continue" button, Ms. Russell agreed to the arbitration provision in the Terms & Conditions.

To the best of Ms. Russell's recollection, relevant portions of the recreated webpage Fluent submitted with its motion to compel arbitration were inaccurate. 4-ER-580. For instance, she did not recall a Target gift card being advertised, she didn't see any legal terms or conditions or a hyperlink to see them, and she didn't see anything about arbitration. *Id*. Consistent with her recollection, when Ms. Russell completed the "Winner Claim Form" she received from Fluent, she completed the sentence "The prize I have won is" with "$1000 gift card Walmart." 4-ER-698.

### 2. Ms. Hernandez did not agree to arbitrate.

Ms. Hernandez recalls visiting a Fluent website but not agreeing to—or seeing anything about—arbitration. A couple of years ago, she heard about websites where she could get free samples. 4-ER-582. She visited one of them on her phone. The website required her to answer personal questions, including private questions about her health. She did not want to answer these questions, so she left the website. 4-ER-582-583. Over the next couple of years, she used her phone to visit other websites to try to get free samples. 4-ER-583.

To the best of Ms. Hernandez's recollection, relevant portions of Fluent's recreation of the website she visited are inaccurate. She does not believe that the screen looked like the recreated webpage Defendants provided with their motion. In particular, she does not recall seeing a screen saying, "Welcome back, stephanie!" or pressing "This is correct, Continue!" She didn't see any legal terms or conditions or a hyperlink to see them. And she didn't see anything about arbitration. *Id*.

## C. The district court denied Defendants' motion to compel arbitration of Ms. Russell's and Ms. Hernandez's claims.

Defendants filed a motion to compel arbitration of Ms. Russell's and Ms. Hernandez's claims on January 21, 2020. 4-ER-644. The parties stipulated to extend the briefing schedule three times to accommodate discovery related to the motion. SER-48-60; 4-ER-636-643; 1-ER-4-6.

The district court denied Defendants' motion on September 1, 2020. 1-ER-9-14. The court held that Defendants did not meet their burden of establishing that Ms. Russell and Ms. Hernandez entered into arbitration agreements. 1-ER-12. The court found there was a dispute as to whether the recreated webpages Defendants submitted in support of their motion "evidenced an agreement with either plaintiff." *Id.* The declaration of Fluent's computer system engineer "very generally explains how he 'recreated' the set of multiple webpages each plaintiff would have seen … and 'regenerated images' of the webpages" but "omitted other

– 12 –

pages from the multiple page 'flow' for these website visits which might have demonstrated that these particular users interacted with these particular pages." *Id.* Because Ms. Russell and Ms. Hernandez submitted declarations that "disput[ed] seeing elements of these pages" and "defendants failed to provide complete information to authenticate the exhibits," the court concluded that "there are material facts in dispute." 1-ER-12-13.

The district court concluded that there was no agreement to arbitrate even without the dispute over Defendants' recreated webpages. 1-ER-13. The webpages Defendants provided "do not conspicuously indicate to users that they are agreeing to the Terms and Conditions, including an agreement to mandatory arbitration." *Id.* Citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014), the court noted that there was no text to notify users they would be agreeing to arbitration and no prompts requiring an affirmative action to demonstrate their assent. 1-ER-13. Instead, "[t]he 'This is correct, Continue!' and 'Continue' buttons plainly refer to the entry of other information on the page, not assent to the Terms & Conditions." *Id.* The button the user must click to proceed to the next webpage "is completely divorced from an expression of assent to the Terms & Conditions or to mandatory arbitration." *Id.* The "exceedingly small" type of the phrase "I understand and agree to the <u>Terms & Conditions</u> which includes mandatory arbitration and <u>Privacy Policy</u>" is also in black print, making it far less visible than

the "larger, more colorful and high-contrast fonts on the rest of the page" and "difficult to read on a large, high-resolution monitor, much less a mobile device." 1-ER-13-14.

**D.    The district court denied Defendants' motion for reconsideration.**

Defendants moved for leave to file a motion for reconsideration of the district court's order denying their motion to compel arbitration, arguing that Ms. Russell's and Ms. Hernandez's deposition testimony contradicted the declarations they filed in opposition to the motion and supported a finding that they agreed to arbitration. The district court denied the motion.

First, the court held that Defendants had "not established that the two new plaintiffs' deposition testimony could not, with diligence, have been presented in connection with their motion." 1-ER-5. Defendants did not depose Ms. Russell and Ms. Hernandez until June 29 and July 2, 2020, even though Defendants knew they would be named as plaintiffs on December 9, 2019, and saw their allegations in the January 5, 2020 amended complaint. *Id.* Then, "defendants elected not to depose Russell and Hernandez at any time during the extended briefing schedule in connection with the motion to compel arbitration" despite having "their declarations more than *seven* weeks prior to the filing of their reply and approximately *five* weeks prior to travel stoppages and office closures forced by the COVID-19 pandemic" and the court being "exceedingly accommodating with

− 14 −

granting extensions of time had defendants requested one to take those depositions." *Id.* Even after taking the depositions, Defendants did not seek leave to supplement their motion but instead waited until the court denied their motion to ask the court to consider the deposition testimony. *Id.*

The district court also found the deposition testimony would not have been material to its denial of the motion to compel arbitration. 1-ER-7–8. "As defendants themselves concede, they based their motion 'on the reasonably prudent user and inquiry notice test under *Nguyen* and their belief that the website alone is sufficient to satisfy that test." 1-ER-7. Defendants changed their position after the court denied their motion, arguing a different, "actual notice" theory "known to defendants at the time of their prior motion" and based on evidence "they previously elected not to provide." 1-ER-7–8 ("Defendants' failure to act diligently and argue persuasively does not entitle them to a second bite at the apple."). The deposition testimony also "does not contradict plaintiffs' declarations in opposition to the motion to compel." 1-ER-8 n.5. "Rather, their testimony indicates that the pages defendants presented during the deposition looked different from the sites they visited, they did not recall seeing any arbitration provision or specific terms and conditions on the webpages they visited, and they would have read any terms and conditions if they had seen a link to them." *Id.*

## V.   SUMMARY OF THE ARGUMENT

The district court adhered to well-established standards for evaluating browsewrap agreement when it held that Fluent's recreated webpages did not provide a reasonably prudent user with notice of the arbitration provision in the hyperlinked Terms & Conditions. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177-79 (9th Cir. 2014). In *Nguyen*, the Court explained that the overall content and design of the website must be considered when determining whether the agreement is enforceable, including "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design." *Id.* at 1177. Following this guidance, the district court cited the absence of a method for the user to affirmatively consent to the Terms & Conditions because the "Continue" button on Fluent's webpages plainly referred to other information on the webpages and not to agreement with the Terms & Conditions. In addition, the text referencing the Terms & Conditions and corresponding hyperlink were formatted in "exceedingly small" black print that contrasted with the much larger and more colorful text and images on the rest of the webpage. In other words, the content and design of the recreated webpages distracted users from the link to the Terms & Conditions rather than drawing their attention to it to ensure they knowingly agreed to the terms, including the mandatory arbitration provision.

Defendants argue that reversal is necessary because some aspects of its webpages are good enough to pass muster. First, they contend that the link to the Terms & Conditions is proximate to the "Continue" button and no more is required, and the district court unreasonably required language expressly connecting the "Continue" button to the user's agreement to the Terms & Conditions. Second, they contend that black text on a white background provides sufficient contrast for the link to the Terms & Conditions and font size doesn't matter. But these elements cannot be plucked out of the context of the webpages' overall content and design. The Court should affirm the district court's denial of Defendants' motion to compel because Fluent's webpages, considered in their entirety, do not put a reasonably prudent user on notice of the arbitration provision.

The district court's alternative finding that there are genuine disputed facts as to whether Plaintiffs agreed to arbitrate is supported by the evidence. Defendants based their motion on webpage images that Fluent "regenerated" from information in its databases that omitted the entire "flow" they contend Plaintiffs followed to ultimately reach the webpage with the link to the Terms & Conditions. Contrary to Fluent's assertions, Plaintiffs did not merely say they could not remember agreeing to arbitrate. Plaintiffs submitted declarations stating they remembered visiting Fluent's websites but disputing the accuracy of the recreated webpages Defendants submitted. The district court did not err in considering this

conflicting evidence and giving Plaintiffs, as the opposing party, the benefit of all reasonable doubts. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991).

The district court did not abuse its discretion in denying Defendants' motion for leave to file a motion for reconsideration because Defendants failed to act with reasonable diligence in providing the court with Plaintiffs' deposition testimony and because the testimony was not materially different from the evidence on which the court based its decision. Defendants took the depositions two months before the district court's ruling, and could have taken them before filing their motion or during the extended briefing period while Plaintiffs took discovery related to the motion. As the district court recognized, Plaintiffs' deposition testimony was consistent with the declarations they filed in opposition to Defendants' motion and therefore provided no basis for the court to reconsider its ruling.

Finally, Defendants are wrong that Freedom and Drips, as nonsignatories to the agreement, can compel arbitration under estoppel and third-party beneficiary theories. Estoppel only applies when a plaintiff's claims rely on the agreement and this Court has held that a TCPA claim against a nonsignatory does not rely on the agreement. *Rahmany v. T-Mobile USA Inc.*, 717 F. App'x 752, 753 (9th Cir. 2018). Defendants have not cited a case in which a court held that nonsignatories could enforce an arbitration provision against a signatory as third-party beneficiaries.

Moreover, they did not submit evidence to support their claim that the reference to
"Marketing Partners" in the Terms & Conditions they claim Ms. Hernandez agreed
to includes Freedom and Drips. Thus, even if the Court finds that Ms. Russell and
Ms. Hernandez agreed to arbitration their claims against Fluent, they may still
litigate their claims against Freed and Drips in court.

## VI.    ARGUMENT

The FAA provides that a court may compel arbitration only "upon being
satisfied that the making of the agreement or the failure to comply therewith is not
at issue." 9 U.S.C. § 4. While the FAA reflects "a liberal federal policy favoring
arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460
U.S. 1, 24 (1983), it places arbitration agreements on "the same footing as other
contracts." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974) (citation
omitted). The FAA's policy in favor of enforcing valid arbitration clauses plays no
role in determining whether an agreement to arbitrate exists in the first place.
*Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 743 (9th Cir. 2014).

As the Fourth Circuit recently commented, "It must be remembered that
mandatory arbitration is not the default form of dispute resolution but rather is
permitted only when the parties agree to it." *Rowland v. Sandy Morris Fin. & Est.
Plan. Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021). "A party cannot be forced
into arbitration. Rather, parties must actually contract to arbitrate disputes between

them." *Id.* "In some cases, an 'electronic 'click' can suffice to signify the acceptance of a contract.' … For the unwary, this can be treacherous." *Id.* at 260 (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016)).

This Court reviews the denial of a motion to compel arbitration de novo. *Nguyen*, 763 F.3d at 1175. "Underlying factual findings are reviewed for clear error." *Id.* Interpretations of contract provisions are reviewed de novo. *Id.*

## A. The district court correctly found there was no agreement to arbitrate.

The party seeking to compel arbitration "must prove the existence of a valid agreement by a preponderance of the evidence." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019).[2] "In the context of online agreements, the existence of mutual assent turns on whether the consumer had reasonable notice of the terms of service agreement." *Id*. As this Court has recognized, "the onus [is] on website owners to put users on notice of the terms to which they wish to bind consumers." *Nguyen*, 763 F.3d at 1178-79. "Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Id*. at 1179.

---

[2] The district court noted that it did not have to "engage in th[e] circular inquiry" into whether a New York choice-of-law provision in the disputed agreement controls "because both California and New York law dictate the same outcome." 1-ER-13 n.4 (quoting *Nguyen*, 763 F.3d at 1175).

1.    The design and content of Fluent's webpages did not put a reasonably prudent user on inquiry notice of the arbitration provision.

While "clickwrap" agreements—which require users to click a button signifying their agreement to a list of terms and conditions appearing on the screen—are routinely enforced by courts across the country, "browsewrap" agreements—which merely provide a hyperlink to the terms—are enforced only when "the user has actual or constructive knowledge of a website's terms and conditions." *Nguyen*, 763 F.3d at 1176 (citation omitted). "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Id.* Browsewrap agreements require "a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service." *Id.* at 1175-76**Error! Bookmark not defined.**.

"Whether a user has inquiry notice of a browsewrap agreement … depends on the design and content of the website and the agreement's webpage." *Id*. at 1177; *see also Wilson*, 944 F.3d at 1219 (constructive notice depends on "the conspicuousness and placement of the terms and conditions, as well as the content and overall design" of the website). "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms

− 21 −

by consumers are essential if electronic bargaining is to have integrity and credibility." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002). Courts consider "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design" in determining "whether a reasonably prudent user would have inquiry notice of a browsewrap agreement." *Id*.  "Several nonexhaustive examples of general characteristics that make a term conspicuous include using larger and contrasting font, the use of headings in capitals, or somehow setting off the term from the surrounding text by the use of symbols or other marks." *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018).

The district court evaluated the content and design of the webpages Fluent recreated for purposes of its motion to compel arbitration and concluded they did not put a reasonably prudent user on notice of the arbitration provision in the hyperlinked Terms & Conditions. 1-ER-13-14. The court noted that the webpages "do not include a specific affirmative means of indicating consent to the Terms & Conditions or arbitration clause." 1-ER-13. As "in *Nguyen*, while there is text including a hyperlink to the terms of the agreement located near a button the user must click to continue, there is no text that notifies users that they will be deemed to have agreed to these terms 'nor prompts them to take any affirmative action to demonstrate assent.'" *Id.* (quoting *Nguyen*, 763 F.3d at 1178-79). Rather, "the

– 22 –

hyperlink to [the Terms and Conditions] is only located in proximity to buttons with which the user must interact to continue." *Id.* The buttons—labeled "This is correct, Continue!" and "Continue" on the webpages Fluent provided—"plainly refer to the entry of *other* information on the page, not assent to the Terms & Conditions." *Id.* (emphasis added). In other words, the user's interaction with the button "is completely divorced from an expression of assent to the Terms & Conditions or to mandatory arbitration." *Id.*

The district court also considered the visibility of the link to the Terms & Conditions, which was "formatted in black font against a white background which is exceedingly small compared to the larger, more colorful and high-contrast fonts on the rest of the page, making it difficult to read on a large, high-resolution monitor, much less a mobile device." 1-ER-13-14. The court noted that the analysis did not change just because the "very small text providing the hyperlink to the Terms & Conditions also uses the words 'which includes mandatory arbitration'" because "the website does not prompt affirmative assent to this statement." *Id.* The district court concluded that "the proffered webpages do not conspicuously indicate to users that they are agreeing to the Terms and Conditions, including an agreement to mandatory arbitration." 1-ER-13.

The district court's findings are reinforced by a closer look at the recreated webpages that Fluent claims Ms. Russell and Ms. Hernandez visited.

       *a.*     *The recreated webpages Fluent claims Ms. Russell visited did not provide reasonably conspicuous notice of the arbitration provision.*

Defendants submitted a recreation of a series of interconnected webpages from Fluent website www.retailproductzone.com that they claim Ms. Russell visited on November 20, 2017. 4-ER-667-668. The first three pages have large colorful boxes at the top announcing the availability of a "TARGET $100 Gift Card," a bright red depiction of the gift card, and a large, royal-blue box with survey questions to complete by clicking large buttons. 4-ER-683-685. The only hyperlinks to the Terms & Conditions on these recreated webpages appear near the end of a dense block of small-font text at the bottom of the page. This fine print, in contrast to the colorful pictures and prominent text at the tops of the pages, is buried in gray text on gray background. The fourth recreated webpage asks the user to confirm her email address with a large blue "Continue" button; the same gray-on-gray text box with the buried hyperlink to the Terms & Conditions appears at the bottom of the pages. 4-ER-686.

The fifth recreated webpage asks the user to "Complete your shipping information to continue towards your reward." 4-ER-688. The heading of the page states "Shipping Information Required" in blue italics, above an item number and bar code that imply that shipment of the gift card merely awaits the user's contact information. The form requires the user to enter her first name, last name, street

– 24 –

address, zip code and telephone. It also asks for "Date of Birth" and provides drop down boxes to enter the information, as well as buttons to select "Male" or "Female." Beneath those buttons, in tiny, barely legible, washed-out text, is the sentence, "I understand and agree to the <u>Terms & Conditions</u> which includes mandatory arbitration and <u>Privacy Policy</u>." The form concludes with a large green button stating "Continue >>" in large white font. Defendants claim that Ms. Russell visited this website on her mobile phone. 4-ER-667. The tiny-print statement that is barely visible on a large computer monitor or printed page would be even less legible on a cell phone screen.

As the district court recognized, the "Continue" button on the recreated webpage that Defendants claim Ms. Russell visited is not expressly linked to the statement about the Terms & Conditions. *See* 4-ER-688. A reasonable user would understand that by clicking the button she was continuing the signup process after completing her shipping information, not agreeing to a multipage agreement found on a separate webpage with terms that dramatically alter her legal rights. Fluent did nothing to draw the user's attention to the agreement she was purportedly entering into and, in fact, very effectively deemphasized that information by putting the statement about the Terms & Conditions in the smallest and least legible font on the page.

Had Fluent wanted to make sure that visitors to the webpage saw the hyperlink, it could have (for instance) required the user to affirmatively acknowledge the agreement by including a phrase like "By continuing past this page, you agree to our Terms of Use" like the websites in the cases Defendants contend are similar to Fluent's. *See Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393, 394-95 (9th Cir. 2020) ("Lee validly assented to Ticketmaster's Terms of Use, including the arbitration provision, each time he clicked the 'Sign In' button when signing into his Ticketmaster account, where three lines below the button, the website displayed the phrase, 'By continuing past this page, you agree to our Terms of Use,' as well as each time he clicked the 'Place Order' button when placing an order for tickets, where directly above the button, the website displayed the phrase, 'By clicking 'Place Order,' you agree to our Terms of Use,' where in both contexts, 'Terms of Use' was displayed in blue font and contained a hyperlink to Ticketmaster's Terms."); *see also Nevarez v. Forty Niners Football Co.*, *LLC*, No. 16-CV-07013, 2017 WL 3492110, at *2-3, 8-9 (N.D. Cal. Aug. 15, 2017) (same); *Rodriguez v. Experian Serv. Corp.*, No. CV-15-3553-R, 2015 WL 12656919, at *2 (C.D. Cal. Oct. 5, 2015) (the uncluttered webpage "contains the exact disclosure that the Ninth Circuit found was missing in *Nguyen*, … an express disclosure and acknowledgement, which stated, 'By clicking the button above … you agree to our Terms of Use'" (second ellipses in original)); *Graf v. Match.com,*

*LLC*, No. CV-15-3911-PA, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) ("all users of the Match.com website during the relevant time period were required to affirmatively agree to the Terms of Use when they clicked on a 'Continue' or other similar button on the registration page where it was explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use, which were always hyperlinked and available for review"); *Crawford v. Beachbody, LLC*, No. 14-cv-1583-GPC, 2014 WL 6606563, at *1 (S.D. Cal. Nov. 5, 2014) ("Immediately above the 'Place Order' box, there was language that said, 'By clicking *Place Order* below, you are agreeing that you have read and understand the Beachbody Purchase Terms and Conditions, and Team Beachbody Terms and Conditions.' The words 'Terms and Conditions' were in blue font, while the surrounding language was in grey font, and were hyperlinked to the actual Terms and Conditions.").

Another court found that a similarly designed Fluent website did not provide sufficient notice of the Terms & Conditions, including mandatory arbitration, to create an enforceable agreement. In *Anand v. Heath*, the plaintiff "registered on the website www.retailproductzone.com and completed a survey on that website to receive a free gift card." 19-cv-0016-JJT, 2019 WL 2716213 (N.D. Ill. June 28, 2019). When the plaintiff "navigated through the www.retailproductzone.com website in 2017, the words 'I understand and agree to the Terms & Conditions

which includes mandatory arbitration and <u>Privacy Policy</u>' were displayed above a 'Continue' button" as depicted in the image displayed in the decision. *Id.* The court concluded that "Anand was not placed on reasonable notice that she was manifesting assent to the terms and conditions by clicking the 'Continue' button." *Id.* at *3. The *Anand* court relied heavily on this Court's analysis in *Nguyen*, citing the lack of "connection between the statement 'I understand and agree ...' and the 'Continue' button apart from the placement of the text above the button." 2019 WL2716213, at *4. The court concluded that "[t]here was simply nothing presented to Anand that conditioned her continued navigation on the site to acceptance of the terms and conditions available through the hyperlink. She cannot, therefore be said to have manifested assent to the statement that she understood and agreed to those terms and conditions by pressing the 'Continue' button." *Id.*

> b.   *The recreated webpage that Fluent claims Ms. Hernandez visited did not provide reasonably conspicuous notice of the arbitration provision.*

The hyperlink to the Terms & Conditions on the recreated webpage that Defendants contend Ms. Hernandez visited on February 16, 2018, is even more obscured by cluttered design and content. The page is filled with eye-catching photos of human faces, the promise that "Getting Free Stuff Has Never Been

Easier," the large colorful text "Welcome, back stephanie!" and a comparatively small box containing all of the following text:

- "Confirm your ZIP Code Below:" in the largest font;

- A yellow box with the zip code 93930 in the same size font;

- In black font so tiny it is barely legible, "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy";

- A green box that says "I AGREE" in white letters to the right of a check box and to the left of the phrase "to receive daily emails from SamplesandSavings and SweepstakesAlerts," printed in black text; and

- A large green button with the following text in large white font: "This is correct, Continue!>>"

4-ER-671. Until their motion for reconsideration, Defendants did not provide the district court with screenshots of any of the webpages they contend Ms. Hernandez visited before arriving at the recreated webpage, which they say was prepopulated with the zip code she had entered on other (unprovided) websites. 4-ER-666-667.

The recreated webpage is a case study in misdirection. Rather than focusing the user's attention on the Terms & Conditions hyperlink, the design of the webpage emphasizes everything else. A reasonably prudent user would be

distracted by the photos and text announcing "Free Stuff," the request that she confirm her zip code and corresponding colorful button to do so, and the colorful "I AGREE" checkbox adjacent to a statement about receiving daily emails.

By contrast, the sentence referencing the Terms & Conditions is in miniscule, barely legible print. It is sandwiched between the pre-populated zip code that the user is asked to confirm and the checkbox to signify agreement to receiving daily emails and is not even adjacent to the button to click to confirm the zip code. A reasonable user viewing this recreated webpage would understand that she was confirming her zip code by clicking on the "This is correct, Continue" button. The "I AGREE" checkbox can only be read to refer to reference agreement to the statement about daily receipt of emails, not the Terms & Conditions. There is no connection between the statement referencing the Terms & Conditions and either the "I AGREE" checkbox or the "This is correct, Continue! >>" button. In any event, Defendants do not contend that Ms. Hernandez checked the checkbox.

2.     The district court correctly considered the content and design of Fluent's webpages in their entirety rather than plucking out isolated elements as Defendants advocate.

This Court has consistently considered webpages presenting browsewrap agreements in their entirety rather than drawing simple bright-line rules about a particular color or size of text or specific language that puts a user on notice of an arbitration provision. In *Nguyen*, the Court explained that "[w]hether a user has

inquiry notice of a browsewrap agreement … depends on the design and content of the website and the agreement's webpage." 763 F.3d at 1177. "In short, the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement." *Id.*; *see also Wilson*, 944 F.3d at 1220 ("Users are put on constructive notice based on the conspicuous and placement of the terms and conditions, as well as the content and overall design of the [website].").

The Second Circuit takes the same approach. As the court summarized in *Nicosia v. Amazon.com, Inc.*, "[c]ourts will give effect to hybridwrap terms where the button required to perform the action manifesting assent (*e.g.*, signing up for an account or executing a purchase) is located directly next to a hyperlink to the terms and a notice informing the user that, by clicking the button, the user is agreeing to those terms." 384 F. Supp. 3d 254, 266 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020). But "[t]he more the hybridwrap design diverges from this basic layout—such as by placing the notice further away from the action button, cluttering the screen with potentially distracting content, or omitting the language explicitly saying that by performing the action the user agrees to be bound by the terms, the less likely courts are to find that inquiry notice has been provided." *Id.*

The district court followed this guidance in concluding that the content and design of Fluent's recreated webpages did not put a reasonably prudent user on notice of the arbitration provision. The district court's ruling did not turn solely on the fact that the webpages do not include language expressly connecting the "Continue" buttons to the user's agreement to the Terms & Conditions, as Defendants suggest. Rather, the district court focused on the fact that "[t]he 'This is correct, Continue!' and 'Continue' buttons plainly refer to the entry of other information on the page, **not** assent to the Terms & Conditions." 1-ER-13 (emphasis added). In other words, not only did Fluent omit language that would have alerted a user that she was agreeing to the Terms & Conditions when she clicked the "Continue" button, Fluent directed the user's attention away from the Terms & Conditions by expressly linking the "Continue" button to **other** information on the cluttered webpages. The district court never suggested that a statement like "by clicking this button" is always required, instead finding that the absence of a similar statement on Fluent's webpages contributed to the lack of adequate notice of Fluent's arbitration provision.

Defendants' apple stand example is instructive. The online world is not as simple as taking an apple from a roadside stand since a reasonable person is typically familiar with the real-world transaction of paying money for another's goods. *Cf. Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401-02, 403 (2d Cir.

2004). Even so, as the Second Circuit recognized in *Register.com*, a visitor to an apple stand who had no notice of the sign saying "Apples-50 cents apiece" "may well prevail" on his argument that he "had no reason to understand upon taking [the apple] that [the seller] was demanding the payment." *Id.* at 401. Once he has seen the sign, however, he "cannot continue on a daily basis to take apples for free, knowing full well that [the seller] is offering them only in exchange for 50 cents in compensation, merely because the sign demanding payment is so placed that on each occasion [the visitor] does not see it until he has bitten into the apple." *Id.*

The district court concluded that a reasonably prudent user is not on notice of the link to the Terms & Conditions on Fluent's webpages and thus, like the apple eater in *Register.com*, had no reason to understand that by clicking "Continue" to agree that her information was correctly entered into the webpage's forms she was agreeing to a whole host of other terms, including individual arbitration. Because internet users routinely exchange their personal information for free services like search engines, email, social networks, and games, Defendants' argument that a reasonable user must know that some sort of an exchange is taking place is a classic red herring. The real question is whether a reasonable user is alerted to what the terms are—and that is why companies like Fluent design webpages that divert a user's attention from unpalatable terms like giving up the right to a jury trial and class litigation. Thus, even if the sign stating

"Apples-50 cents apiece" in Defendants' apple stand scenario had been displayed where the apple eater could see it before taking that first bite, the seller would not be entitled to enforce an arbitration provision hidden on the back of the sign.

Defendants' comparison of the language referring to terms and conditions on its webpages with references to terms and conditions on other websites is not particularly useful because it removes the language from its context. The context matters because, as this Court has repeatedly explained, courts must consider the webpage's overall design and content. *See Wilson*, 944 F.3d at 1220; *Nguyen*, 763 F.3d at 1177. Fluent chose to link the "Continue" buttons on its webpages to information other than the terms and conditions—confirming Ms. Russell's shipping information, date of birth, and gender and Ms. Hernandez's zip code and agreement to receive daily emails—and omit any cautionary language like, "By clicking this button, you agree to the Terms & Conditions." 1-ER-15-16. In addition, the webpages include other distracting elements like a colorful Target gift card and bar code and photos of "free stuff" and happy shoppers that draw the eye away from the reference to the terms and conditions. *Id.*

Defendants rely on cases in which the webpage directly linked the button the user had to click to proceed with agreement to the terms, unlike Fluent's webpages. In *Snow v. Eventbrite, Inc.*, the green "Pay Now" button appeared directly below the statement "I accept the terms of service and have read the privacy policy" on a

– 34 –

webpage that contained only fields for the user's payment information with no other distracting images or statements and thus no question that the user was agreeing to purchase tickets on the hyperlinked terms. No. 3:20-cv-03698-WHO, 2020 WL 6135990, at *7 (N.D. Cal. Oct. 19, 2020). In *Nicosia*, the reference to the terms ("By signing up, you acknowledge that you have read and agree to the <u>Amazon Prime Terms and Conditions</u> ...") was directly linked to the "Sign up for Amazon Mom" button because it was placed directly below the button, used parallel language, and did not reference agreement to other information like Fluent's webpages do. 384 F. Supp. 3d at 266, 279. In *PDC Labs., Inc. v. Hach Co.*, "the Terms were hyperlinked on three separate pages of the online … order process in underlined, blue, contrasting text" and were "specifically referenced in the final order step, which read: "STEP 4 of 4: Review terms, add any comments, and submit order." No. 09-1110, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009). And as the district court recognized, Defendants' reliance on *Garcia v. Enterprise Holdings, Inc.*, 78 F. Supp. 3d 1125, 1129-31, 1137 (N.D. Cal. 2015), was misplaced because there the "plaintiff alleged privacy violations and the hyperlink to the 'Privacy Policy' at issue was in the same text box as the 'Okay' button for completing registration through Facebook, putting plaintiff on notice of the Privacy Policy terms." 1-ER-12 n.1.

It is similarly unhelpful—and contrary to this Court's guidance—to consider the color and size of the font Fluent used to reference the terms in isolation, as Defendants urge the Court to do. The district court evaluated Fluent's use of "exceeding small" black font in the context of the webpages as a whole, including the "larger, more colorful and high-contrast fonts on the rest of the page" and the difficulty reading the text "on a large, high-resolution monitor, much less a mobile device." 1-ER-13-14. There is of course nothing wrong with black print on a white background as a general concept—we are all used to reading books, magazines, and legal briefs printed in black ink on white paper. But referencing a website's terms in the smallest print on a page and in black font when there are a variety of other statements in much bigger and more colorful font can be a problem because, as with Fluent's webpages, the user's eye is drawn to the larger, more vibrant text and images on the screen. *See* 1-ER-15-16.

In the cases Defendants cite, courts appropriately considered the font and hyperlinks in the context of the webpages as a whole. *See, e.g., Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78-79, 82 (2d Cir. 2017) (finding the small print of the reference to blue, underlined hyperlinked terms on an "uncluttered" payment screen directly below a "Register" button with the warning that "By creating any Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY" was reasonably conspicuous). In *Dohrmann v. Intuit, Inc.*, for example, this Court

concluded that although the hyperlink to the terms in the statement "By clicking Sign In, you agree to the Turbo Terms of Use …" was not underlined, the "relevant warning language and hyperlink to the Terms of Use were conspicuous—they were the only text on the webpage in italics, were located directly below the sign-in button, and the sign-in page was relatively uncluttered." 823 F. App'x 482, 484 (9th Cir. 2020). In *Peter v. DoorDash, Inc.*, the reference to the terms was on an "uncluttered and wholly visible" screen like the one in *Meyer*, with cautionary text stating "By tapping Sign Up, Continue with Facebook, or Continue with Google, you agree to our Terms and Conditions and Privacy Statement" directly below the sign-up button that was "plainly readable" with blue hyperlinks to the terms and privacy statement. 445 F. Supp. 3d 580, 582, 586-87 (N.D. Cal. 2020). And in *Feld v. Postmates, Inc.*, the reference to the terms appeared in a sign-up box that pops up in front of the home screen and above the "Sign Up" button and provided a "clear prompt" that by "clicking the Sign Up or Facebook button, you agree to [Postmates'] **Terms of Service** and **Privacy Policy.**" 442 F. Supp. 3d 825, 830-31 (S.D.N.Y. 2020) (alteration in original).

In contrast to these cases, the reference to the Terms & Conditions on Fluent's cluttered webpages is hard to read even on a large computer screen and is obscured by bigger and more colorful text and images. *See* 1-ER-15-16. Fluent chose to omit any kind of warning or "clear prompt" that clicking the "Continue"

– 37 –

or "This is correct, Continue!" button would bind the user to the Terms & Conditions, and instead connect the continuation of the multi-webpage process to entry or confirmation of the user's contact information. Defendants have not cited any case in which a website design like Fluent's was found to provide reasonably prudent users with conspicuous notice of their agreement to terms and conditions. The Court should affirm the district court's denial of Defendants' motion to compel arbitration.

      3.    <u>The district court did not err in finding in the alternative that there were material disputed facts.</u>

If the Court affirms the district court's ruling that Fluent's webpages do not put a reasonably prudent user on notice of the arbitration provision in the Terms & Conditions, it does not have to consider the district court's alternative finding that there are material facts in dispute because "defendants failed to provide complete information to authenticate the exhibits" and "plaintiffs each submit[ted] declarations disputing seeing elements of the[] pages." 1-ER-12-13. This alternative finding is supported by the evidence before the district court.

Defendants acknowledge that they bear the burden of proving the existence of a valid agreement by a preponderance of the evidence. *See Wilson*, 944 F.3d at 1219. The evidence Defendants chose to rely on was the declaration of Fluent employee Mitenkumar Bhadania, in which he "very generally explains how he 'recreated' the set of multiple webpages each plaintiff would have seen when they

visited the websites based on a unique visitor ID generated for each session, and 'regenerated images' of the webpages." 1-ER-12. As the district court noted, the recreated webpages "are the equivalent of blank form contracts, with no clear indication that these plaintiffs agreed to them." *Id.* Moreover, Fluent "elected to omit other pages from the multiple page 'flow' for these website visits which might have demonstrated that these particular users interacted with these particular pages." *Id.*

That the recreated webpages were akin to "blank form contracts" and omitted pages from the "flow" is particularly relevant in this case because Fluent acknowledges that it operates "a number of consumer-facing websites" offering different enticements such as "the opportunity to obtain rewards, enter into sweepstakes, receive job listings, receive product samples, or receive other content." 4-ER-665. The websites also have different survey questions depending on the campaign. 4-ER-746.[3] After reviewing Fluent's recreated webpages,

---

[3] Fluent knew Plaintiffs and the district court considered the entire "flow" to be important. Earlier in the litigation, Defendants filed a declaration from Mr. Bhandania in support of their motion to compel arbitration of Plaintiff Berman's claims that "included a single image that Bhadania described as a 'regenerated HTML representation of the page showing the agreement to the Terms and Conditions of the user.'" 4-ER-746 (quoting Dkt. No. 16-1 ¶ 10). Mr. Bhadania later submitted a declaration in support of Defendants' motion for summary judgment stating that he had "now 'replicated and pieced together' all the webpages the registrant would have seen for 'the vast majority of the flow related to the Berman lead,' the only difference being that the 'actual flow' would have

Plaintiffs submitted declarations that called into question the accuracy of Fluent's recreations.

Ms. Russell remembered visiting Fluent's website. She stated that she responded to an ad asking if she wanted to win a Walmart gift card and clicking on the ad took her to a series of questions, followed by a form for her contact information. 4-ER-579. Fluent's recreated webpage showed a Target gift card. 1-ER-16. Ms. Russell did not recall seeing a Target gift card advertised. 4-ER-580. She also did not remember seeing "any legal terms or conditions or a hyperlink to click to see them." *Id.* Ms. Hernandez also remembered visiting Fluent's website to obtain free samples of products. 4-ER-582. She remembered leaving the website when she was required to answer a series of questions that included questions about her health. 4-ER-582-583. She acknowledges that she visited other websites to try to get free samples but did not recall seeing the recreated webpage that Defendants claimed evidenced her agreement to arbitrate. 4-ER-583.

This is *not* a case where the plaintiffs merely said they cannot recall agreeing to arbitrate, as in the cases Fluent cites.[4] Plaintiffs disputed specific aspects of

included approximately fifty survey questions but the attached exhibit includes only two." *Id.* (quoting Dkt. No. 152-3 ¶¶ 4-7). The district court sustained Plaintiffs' objection to the newly recreated "flow" and refused to consider it because Defendants never produced it in discovery. 4-ER-746-747.

[4] *See Knepper v. Ogletree*, No. 8:19-cv-00060-JVS-ADS, 2019 WL 1449502, at *5 (C.D. Cal. Mar. 26, 2019) (plaintiff was unable to remember receiving three emails

Fluent's recreated webpages, like Ms. Russell's recollection that she responded to an ad for a Walmart gift card, not a Target gift card. Defendants' own submission supports Ms. Russell's recollection; Mr. Bhadania attached Ms. Russell's "Winner Claim Form" to his declaration in which she completed the statement "The prize I have won is" with "$1000 gift card Walmart." 4-ER-698. The district court did not err in considering the competing declarations, giving Plaintiffs as the opposing parties the benefit of all reasonable doubts, and finding that material facts were in dispute. *See Three Valleys*, 925 F.2d at 1141 ("The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party

---

from her employer about an arbitration agreement and sending an email in response saying she would be "turn[ing] mine in tomorrow" but located the emails before filing her lawsuit, making "the only potential dispute … whether Knepper read the three email notices, not whether she received them"); *Beattie v. TTEC Healthcare Solutions, Inc.*, No. 1:18-cv-01574-RM-SKC, 2019 WL 2189481, at *2 (D. Colo. May 21, 2019) (finding no genuine dispute of fact where the plaintiffs did not deny executing their employer's arbitration agreement but said they did not recall doing so and the employer offered the declaration of its director of human capital explaining that employee data collected and maintained in company spreadsheets showed they did); Order at 3-4, *Gonzalez-Torres v. Zumper, Inc.*, No. 4:19-cv-02183-PJH (N.D. Cal. July 25, 2019), ECF No. 30 (denying plaintiff's request for discovery into whether an agreement was ever formed between the parties where plaintiff did not recall reading an arbitration provision but did not argue he was never presented with the agreement containing the arbitration provision); *see also Gonzalez-Torres v. Zumper, Inc.*, No. 4:19-cv-02183-PJH, 2019 WL 6465283, at *5 (N.D. Cal. Dec. 2, 2019) (in opposing motion to compel arbitration, plaintiff did not dispute the accuracy of the account creation window the defendant submitted, including a link to terms and conditions containing an arbitration provision).

the benefit of all reasonable doubts and inferences that may arise." (citation omitted)).

Defendants argue that Plaintiffs did not lodge a formal evidentiary objection to the recreated webpages, but Plaintiffs disputed the accuracy of the webpages in opposing Defendants' motion. *See* 4-ER-605-613. Plaintiffs asked the district court to strike the full "flow" exhibits when Defendants filed them with their motion for reconsideration. 1-ER-2 n.1. The district court "agree[d] that defendants should not be permitted to submit this evidence in support of their bid for reconsideration of its decision on the motion," struck it, and did not consider it. *Id.* Defendants' suggestion that the district court should have considered the complete "flows" because they were filed with their opposition to Plaintiffs' motion for class certification—a motion the district court has yet to decide—is similarly unpersuasive since Defendants never brought them to the district court's attention in connection with their motion to compel arbitration. This is particularly true since the district court admonished the parties early in the case that "all evidence they seek to have considered in connection with a motion must be filed **with the briefs** (even if it has been submitted previously)" because "[c]ross-referencing of evidence unnecessarily creates a burden for the Court and decreases efficiency." 4-ER-754 at n.12.

Because the district court found as a matter of law that Fluent's webpages failed to put a reasonably prudent user on notice of the arbitration provision, there was no need to conduct a "mini-trial" on the issue of whether an agreement to arbitrate was formed. If the Court does not affirm on that basis and instead finds that there are disputes of material fact, Plaintiffs agree that the Court should remand to the district court for a trial. 9 U.S.C. § 4; *see also Three Valleys*, 925 F.2d at 1141; *Meyer*, 868 F.3d at 74.

## B. The district court did not abuse its discretion in denying Defendants' motion for reconsideration.

The district court denied Defendants' motion for reconsideration because they failed to meet their burden for two reasons: (1) they did not act with reasonable diligence because the deposition testimony they cited was available to them two months before the court's order and could have been available to them much sooner; and (2) the deposition testimony was not materially different from the evidence before the court at the time of its decision. As the district court recognized, "reconsideration of a prior ruling is an 'extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources.'" 1-ER-3 (quoting *Kona Enter., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)). "A motion for reconsideration cannot be used to raise arguments or present evidence for the first time that reasonably could have been raised in connection with the ruling at issue." *Id.* (citing *Kona Enter.*, 229 F.3d at 890).

– 43 –

Defendants moved for reconsideration under Civil Local Rule 7-9(b), which "requires that a party seeking leave to file a motion for reconsideration show reasonable diligence in making the motion and one of the following:

> (1) That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought. The party also must show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or
>
> (2) The emergence of new material facts or a change of law occurring after the time of such order; or
>
> (3) A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order."

1-ER-3. Similarly, this Court has explained that "[r]econsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). The Court reviews denials of motions for reconsideration for abuse of discretion. *Kona Enter.*, 229 F.3d at 883.

The district court did not abuse its discretion in finding that Defendants were not reasonably diligent. Defendants delayed taking Plaintiffs' depositions until after briefing on the motion was complete—despite multiple extensions to the briefing schedule to accommodate discovery related to the motion—and then, once

they had the deposition testimony they now contend was material to their motion, they chose to not bring it to the district court's attention before its September 1, 2020 ruling. Defendants knew that Plaintiffs intended to add new plaintiffs as early as **October 18, 2019**, when the parties filed a joint stipulation proposing schedules for filing of the amended complaint and class certification briefing, and expressly sought leave to reopen fact discovery, including to take depositions of "any additional putative class representative." SER-61. Plaintiffs filed their motion for leave to file the amended complaint on **December 9, 2019** (Dkt. No. 212), six weeks before Defendants filed their motion to compel arbitration on **January 21, 2020**. *See* 4-ER-644-663.

As Defendants note elsewhere in their brief, the briefing schedule on the motion to compel arbitration was delayed more than once to allow Plaintiffs to take discovery related to the motion. Opening Br. at 57 n.6. After reviewing Defendants' motion to compel, Plaintiffs sought discovery of Fluent's computer systems, including a virtual site visit, to understand Fluent's recreation of the webpages it claimed Plaintiffs visited. 4-ER-636-643. To accommodate this discovery, on **February 1, 2020**, the parties stipulated to extend Plaintiffs' deadline to respond to the motion by three weeks with a corresponding extension for Defendants' reply. SER-57-59. The parties "agreed to conduct certain limited discovery that may inform the arguments concerning the Motion and, with the

– 45 –

guidance of Magistrate Judge Corley, have been meeting and conferring regarding that discovery." SER-58. Plaintiffs agreed to "provide Defendants with declarations from Plaintiffs Hernandez and Russell concerning their current knowledge and memory, if any, of what the websites looked like when they visited them." *Id.* And the parties agreed to extend "Defendants' deadline to complete discovery propounded on Plaintiffs Hernandez and Russell, including depositions" by nearly four weeks. *Id.*; *see also* 4-ER-737-738.

On **February 19, 2020**, the parties stipulated to extend the deadline for Plaintiffs' response to the motion by another three weeks and to further extend discovery deadlines, including the deadline for Defendants to take discovery from Plaintiffs. SER-52-56. The parties explained that the extension was necessary to complete discovery related to Defendants' motion to compel arbitration that "may be helpful to the Court both with respect to the Motion and the upcoming renewed motion for class certification." *Id.* at 2. The parties stipulated to a final extension on March 19, 2020, requesting an additional six days, until **March 30, 2020**, for Defendants to file their reply. SER-44-47.

Defendants knew about the new plaintiffs nearly three months before filing their motion to compel arbitration and knew Plaintiffs' identities six weeks before filing their motion. Defendants were provided with Plaintiffs' declarations attesting to their recollections nearly two months before filing their reply. Nonetheless,

– 46 –

Defendants did not take Plaintiffs' depositions until June 29 and July 2, 2020. 1-ER-6. Defendants' claim that the parties were focused on the class certification schedule and discovery ignores the discovery hearings and extensions to the briefing schedule to accommodate the Plaintiffs' discovery in connection with the arbitration motion. If Plaintiffs could multitask during this time, why not Defendants? Defendants also refer to "the logistics and novelty" of taking depositions during the pandemic but the parties were able to plan and conduct a virtual site visit of Fluent on February 26, 2020. *See* 4-ER-636-643; SER-48-51.

Defendants then sat on the deposition testimony for two months, choosing not to bring it to the district court's attention before its September 1, 2020 ruling on their motion. They now claim to have deferred to courts' general disfavor of "unsolicited briefs on new issues with new evidence" after motions have been submitted. Opening Br. at 72. But Defendants could have sought court approval to file a supplemental brief under Civil Local Rule 7-3(d) to submit the new evidence they now say was material to the only issue before the court: whether Plaintiffs agreed to arbitrate their TCPA claims. Apparently Defendants' position is that it is preferable to defer relevant discovery until briefing is complete and then withhold the results until receiving an unfavorable ruling. *Cf. Wilson*, 944 F.3d at 1220 ("Huuuge wanted it both ways—if it won the motion to compel, great; if it didn't win, only then did it want discovery. Although Huuuge had the burden to present

– 47 –

evidence of actual notice, it rolled the dice and chose not to pursue additional discovery at the outset, instead moving to stay discovery pending the motion to compel arbitration.").

A more plausible explanation for Defendants' failure to notify the district court of the deposition testimony before losing their motion is that they recognized the testimony was entirely consistent with the evidence already before the court and therefore immaterial. Neither Ms. Russell nor Ms. Hernandez testified that they understood they were agreeing to arbitrate their claims when they visited Fluent's websites on their cell phones. Ms. Russell testified that she did not recall seeing a reference to mandatory arbitration, would have read the terms and conditions if she had seen the link to them, and probably would not have clicked "continue" if she knew she was agreeing to mandatory arbitration. 2-ER-67-71, 89-91. She did not remember seeing the reference to arbitration or any specific terms and conditions on the webpage, which she found "very confusing to use." 2-ER-107-108. In fact, Ms. Russell testified that her reading of the text next to the "I agree" checkbox on the Fluent webpage that she did not visit—in response to Defendants' counsel's questions about the webpage Ms. Hernandez visited—is that by checking the box she would be agreeing to receive email samples and savings and sweepstakes alerts, nothing more. 2-ER-127-128. Ms. Hernandez likewise testified that she would have read the terms and conditions on Fluent's website

because it is not a well-established business that is familiar to her, like Costco, Walmart, or Lowe's. 2-ER-216-218. And she testified that the Fluent website she visited looked different than the version Defendants showed her at her deposition. 2-ER-190-193.

Ms. Russell's and Ms. Hernandez's deposition testimony was thus entirely consistent with the declarations they filed in opposition to the motion to compel arbitration. Both stated that they did not "remember any legal terms or conditions or a hyperlink to click to see them" or "anything about arbitration or agreeing to arbitration." 4-ER-580; 4-ER-583. At most, the deposition testimony Defendants cite shows that Ms. Russell and Ms. Hernandez were able to see the reference to arbitration when taking their time in a deposition to focus on a much larger version of a webpage they may or may not have previously visited on their cell phones and with Defendants' counsel directing their attention to the relevant language.

After considering Plaintiffs' deposition testimony, the district court concluded that it "does not contradict plaintiffs' declarations in opposition to the motion to compel." 1-ER-8 n.5. In fact, "their testimony indicates that the pages defendants presented during the deposition looked different from the sites they visited, they did not recall seeing any arbitration provision or specific terms and conditions on the webpages they visited, and they would have read any terms and conditions if they had seen a link to them." *Id.* Because Plaintiffs' deposition

testimony consistent with the evidence before the district court when it denied the motion to compel arbitration, the district court did not err in refusing to consider it.

The district court also noted that Defendants' motion for reconsideration presented a new legal theory, albeit one that was known to them when they filed their original motion. Having lost their argument that the recreated webpages put a reasonably prudent user on inquiry notice of the arbitration provision, they shifted to an argument that Plaintiffs had *actual* notice of the arbitration provision. "In other words, defendants' failure to prevail on one theory led them to seek reconsideration to argue a different one, and to offer evidence they previously elected not to provide." 1-ER-7-8. The district court explained that "[p]lainly, seeking to argue a different legal theory known to defendants at the time fo their prior motion provides no ground for reconsideration." 1-ER-8.

As discussed above, even if the district court had entertained Defendants' new theory, Plaintiffs' deposition testimony does not establish their actual knowledge of the arbitration provision. The cases Defendants cite do not support their argument that it does. This is not a case like *Register.com*, where the plaintiff "admits that it knew perfectly well what terms Register demanded" because it "was daily submitting numerous queries, each of which resulted in its receiving notice of the terms Register exacted." 356 F.3d at 401. Nor is like the other cases Defendants cite where courts found the plaintiffs had actual notice of an arbitration

provision from a source *other than* the visited website. *See Nicosia*, 815 F. App'x at 613 ("Nicosia received notice of the arbitration clause no later than September 2014, when Amazon filed a letter motion in this litigation raising the arbitration clause as a ground for dismissal. Nicosia admitted making at least twenty-seven purchases through Amazon.com since that date, conduct that 'a reasonable person would understand to constitute assent.' (citation omitted)); *Sw. Airlines Co. v. Boardfirst, L.L.C.*, No. 3:06-cv-0891-B, 2007 WL 4823761, at *2–4 (N.D. Tex. Sept. 12, 2007) ("There is no dispute that BoardFirst has had actual knowledge of Southwest's Terms at least since Kate Bell received from Southwest the December 20, 2005 cease-and-desist letter in which Southwest informed Bell that the Terms forbid the use of the Southwest website for commercial purposes."); *Ticketmaster Corp. v. Tickets.Com, Inc.*, No. CV-997654–HLHVBKX, 2003 WL 21406289, at *2 (C.D. Cal. Mar. 7, 2003) ("[T]here has been developed evidence that TX was fully familiar with the conditions TM claimed to impose on users, including a letter from TM to TX which quoted the conditions (and a reply by TX stating that it did not accept the conditions).").

## C. Even if there is an agreement to arbitrate, neither Freedom nor Drips may compel arbitration.

Defendants argued in a footnote of their motion to compel that Freedom and Drips could compel arbitration under estoppel and third-party beneficiary theories, providing no legal argument or factual support. In the district court, as in this

Court, "arguments 'raised only in footnotes … are generally deemed waived.'"
*Castro v. ABM Indus., Inc.*, 325 F.R.D. 332, 334 n.3 (N.D. Cal. 2018) (alteration in original) (quoting *Estate of Saunders v. C.I.R.*, 745 F.3d 953, 962 n.8 (9th Cir. 2014)); *see also City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010) (failing to address an issue in an opening brief except in a footnote waives the argument). Even if the Court considers this argument, the "strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement," *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009) (citation omitted).

The Court has said it sees "no basis for extending the concept of equitable estoppel of third parties in an arbitration context beyond the **very narrow confines**" of existing jurisprudence. *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009) (emphasis added). The doctrine applies to a nonsignatory's effort to enforce an arbitration clause

> in two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are "intimately founded in and intertwined with" the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and "the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement."

*Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128–29 (9th Cir. 2013) (alteration in original) (citations omitted). Neither applies in this case.

As the Court recently explained, "[a]pplying equitable estoppel against a signatory requires looking to 'the relationships of persons, wrongs and issues,' with a particular focus on whether the claims the non-signatory seeks to arbitrate are 'intimately founded in and intertwined with the underlying contract obligations.'" *In re Pac. Fertility Ctr. Litig.*, 814 F. App'x 206, 208-09 (9th Cir. 2020) (quoting *Goldman v. KPMG LLP*, 92 Cal. Rptr. 3d 534, 543 (Cal. Ct. App. 2009)). "This involves examining the facts alleged in the complaint and whether they rely or depend on the terms, duties, or obligations in the contract containing the arbitration provision in asserting the claims." *Id.* "If the claims 'are fully viable without reference to the terms of [the contract],' equitable estoppel does not apply." *Id.* (alteration in original) (quoting *Goldman*, 92 Cal. Rptr. at 551).

The theory behind equitable estoppel is that a plaintiff may not, 'on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory.'" *In re Henson*, 869 F.3d 1052, 1060 (9th Cir. 2017) (quoting *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013)). "If this were permitted, then a signatory to an agreement, such as Henson, would 'have it both ways'—that is, he could sue the

non-signatory … under the terms of the agreement containing the arbitration clause, but ignore the arbitration requirement because [the defendant] is a non-signatory." *Id.*

These fairness concerns do not arise in this case because Plaintiffs are not suing Freedom and Drips under the Terms & Conditions, which are not even mentioned in Plaintiffs' Third Amended Complaint. *See* 4-ER-699-736. Plaintiffs assert only claims for violation of the TCPA. *See Goldman*, 92 Cal. Rptr. 3d at 552 (equitable estoppel did not apply because the plaintiffs did "*not* rely on, or even mention, the terms of the operating agreements"). This Court has recognized that express consent under the TCPA is an affirmative defense. *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 n.3, 1044 (9th Cir. 2017). For this reason, a TCPA claim against a nonsignatory to an arbitration agreement does not rely on the agreement even if the nonsignatory asserts a defense of express consent based on the agreement. *Rahmany v. T-Mobile USA Inc.*, 717 F. App'x 752, 753 (9th Cir. 2018), *cert. denied sub nom. Subway Sandwich Shops, Inc. v. Rahmany*, 139 S. Ct. 211 (2018).

In *Rahmany*, Subway argued that the agreement between the wireless provider that sent spam texts on its behalf and its users authorized the communications and required arbitration of the plaintiffs' TCPA claims. *Id.* The Court held the plaintiffs' TCPA claims were not subject to arbitration even though

– 54 –

resolving the issue of prior express consent would require consideration of the wireless agreement. *Id.* ("The TCPA, not the Wireless Agreement, creates and defines any alleged duty to refrain from sending an unwanted text message."); *see also Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1094-95 (9th Cir. 2020) (equitable estoppel did not apply where plaintiffs' ADA claims did not assert any violation of any duty, obligation, term or condition imposed by the agreement containing the arbitration provision); *In re Henson*, 869 F.3d at 1060-61 (even where the plaintiff alleges the nonsignatory defendant engaged in concerted misconduct with a signatory, the nonsignatory may only enforce an arbitration clause where the plaintiff's claims are "dependent on or inextricably bound up with the contractual obligations of the agreement containing the arbitration clause" (citation omitted)); *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847-48 (9th Cir. 2013) (plaintiff was not equitably estopped from avoiding arbitration because he did not allege that any party breached the agreement or seek to enforce the agreement, and instead his statutory claims were separate from the agreement); *Ioane v. MRS BPO, LLC*, 484 F. Supp. 3d 888, 892-94 (D. Haw. Sept. 4, 2020) (collecting cases in which courts hold that TCPA claims "do not rely on the terms of a written agreement even if the claims presume the existence of such an agreement").

The cases Defendants cite are not persuasive. In *Temple v. Best Rate Holdings LLC*, the court held a nonsignatory could enforce an arbitration provision because the plaintiff used the defendant's website to request quotes from "third-party mortgage and/or home loan-related product and/or service providers" and the agreement advised plaintiff that the defendant did not provide those services, putting the plaintiff on notice that his use of the website was creating relationships with the third parties that provided the quotes. 360 F. Supp. 3d 1289, 1296, 1311-12 (M.D. Fla. 2018). Defendants also rely on two district court cases that precede *Rahmany* by several years and addressed claims that were intertwined with the agreement containing the arbitration provision. *See Torbit, Inc. v. Datanyze, Inc.*, No. 5:12-cv-05889-EJD, 2013 WL 572613, at *4 (N.D. Cal. Feb. 13, 2013) (company founded by plaintiff's former employee could compel arbitration of plaintiff's claim for violation of Colorado's Uniform Trade Secrets Act even though only employee was a signatory because proof that it was knowingly using plaintiff's trade secrets relied on interpretation of the agreement);[5] *Simpson v. Pulte Home Corp.*, No. C 11-5376 SBA, 2012 WL 1604840, at *6-7 (N.D. Cal. May 7, 2012) (equitable estoppel where plaintiffs alleged signatory and nonsignatory were

---

[5] Other courts note that *Torbit*'s holding that nonsignatory can compel arbitration when a plaintiff's allegations "touch matters" covered by an arbitration provision departs from the legal framework set forth in *Goldman*, *Kramer*, and *Murphy*. *See Waymo v. Uber Techs., Inc.*, 252 F. Supp. 3d 934, 940-41 (N.D. Cal. 2017).

involved in joint enterprise to defraud plaintiffs into purchasing property pursuant to the agreement and "cannot have it both ways" by claiming both defendants misled them into signing a purchase agreement but claiming one defendant could not enforce the arbitration provision in the agreement).

Defendants also argue that Freedom and Drips can compel arbitration of Ms. Hernandez's claims because the arbitration provision in the Terms & Conditions references Fluent's "Marketing Partners." Defendants have not cited a case in which a court granted a motion to compel brought by nonsignatories who claim to be third-party beneficiaries to an agreement with an arbitration provision. One of the cases Defendants cite notes that courts in the Second Circuit generally only permit non-signatories to compel signatories to arbitrate under an estoppel theory, not third-party beneficiary theory. *See Temple*, 360 F. Supp. 3d at 1308-09. In *Spano v. V & J Nat'l Enters., LLC*, the issue was whether nonsignatory defendants were estopped from *avoiding* arbitration, not whether they could compel the plaintiff to arbitrate. 264 F. Supp. 3d 440, 452-53 (W.D.N.Y. 2017). Moreover, the "Marketing Partners" are not identified anywhere in the Terms & Conditions or any of the documents Defendants submitted with their motion. *See* 4-ER-670-681. Defendants have failed to meet their burden of proving that Freedom and Drips are third-party beneficiaries of the Terms & Conditions. *Murphy*, 724 F.3d at 1233-34.

Finally, Defendants argue in a footnote that Drips can enforce the arbitration provision because Plaintiffs allege it acted as Fluent's agent. But an agent can only enforce an arbitration provision in an agreement when the plaintiff's claims against the agent are related to specific terms of the agreement. *Amisil Holdings Ltd. v. Clarium Capital Mgmt. LLC*, 622 F. Supp. 2d 825, 835-36 (N.D. Cal. 2007); *see also Britton v. Co-op Banking Group*, 4 F.3d 742, 748 (9th Cir. 1993) (agent could not enforce an arbitration clause when the plaintiff's claims against him "were unrelated to any provision or interpretation of the contract"). Moreover, as *Amisil* makes clear, courts have granted nonsignatory agents' motions to compel arbitration when the agents are the employees or officers of the signatory company, which is not the case with Fluent and Drips. *See Amisil*, 622 F. Supp. 2d at 833 (one reason courts hold nonsignatory agents can enforce arbitration provisions is because "[a]n … entity can only act through its employees, and an arbitration agreement would be of little value if it did not extend to [them]" (alterations in original) (citation omitted)).

## VII.   CONCLUSION

Plaintiffs request that the Court affirm the district court's denial of Defendants' motion to compel arbitration on the grounds that Fluent's recreated webpages do not put a reasonably prudent user on notice of the arbitration provision as a matter of law. Alternatively, Plaintiffs request the Court affirm the

district court's denial of the motion on the grounds that there are material issues of disputed fact and remand for a trial on the issue of whether a contract was formed.

RESPECTFULLY SUBMITTED AND DATED this 10th day of May, 2021.

TERRELL MARSHALL LAW GROUP PLLC

By:  /s/ Beth E. Terrell
      Beth E. Terrell, CSB #178181
      Email: bterrell@terrellmarshall.com
      Jennifer Rust Murray, *Admitted Pro Hac Vice*
      Email: jmurray@terrellmarshall.com
      Amanda M. Steiner, CSB #190047
      Email: asteiner@terrellmarshall.com
      936 North 34th Street, Suite 300
      Seattle, Washington 98103-8869
      Telephone: (206) 816-6603

      Anthony I. Paronich, *Admitted Pro Hac Vice*
      Email: anthony@paronichlaw.com
      PARONICH LAW, P.C.
      350 Lincoln Street, Suite 2400
      Hingham, Massachusetts 02043
      Telephone: (617) 738-7080
      Facsimile: (617) 830-0327

      Edward A. Broderick, *Admitted Pro Hac Vice*
      Email: ted@broderick-law.com
      BRODERICK LAW, P.C.
      99 High Street, Suite 304
      Boston, Massachusetts 02110
      Telephone: (617) 738-7080
      Facsimile: (617) 830-0327

Matthew P. McCue, *Admitted Pro Hac Vice*
Email: mmccue@massattorneys.net
THE LAW OFFICE OF MATTHEW P. McCUE
1 South Avenue, Suite 3
Natick, Massachusetts 01760
Telephone: (508) 655-1415
Facsimile: (508) 319-3077

Michael F. Ram, CSB #104805
Email: mram@forthepeople.com
MORGAN & MORGAN
101 Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone: (415) 358-6913

*Attorneys for Plaintiffs-Appellees*

## STATEMENT OF RELATED CASES

Plaintiffs are not aware of any related cases pending before the Court.

DATED this 10th day of May, 2021.

TERRELL MARSHALL LAW GROUP PLLC


By:  /s/ Beth E. Terrell
      Beth E. Terrell, CSB #178181
      Email: bterrell@terrellmarshall.com
      936 North 34th Street, Suite 300
      Seattle, Washington 98103-8869
      Telephone: (206) 816-6603

*Attorneys for Plaintiffs- Appellees*

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION,**
**TYPEFACE REQUIREMENTS, AND**
**TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 13,983 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

14-point Times Roman.

DATED this 10th day of May, 2021.

TERRELL MARSHALL LAW GROUP PLLC


By:   /s/ Beth E. Terrell
       Beth E. Terrell, CSB #178181
       Email: bterrell@terrellmarshall.com
       936 North 34th Street, Suite 300
       Seattle, Washington 98103-8869
       Telephone: (206) 816-6603

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I, Beth E. Terrell, certify that on May 10, 2021, I electronically filed the document entitled Appellee's Answering Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF System.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED this 10th day of May, 2021.

TERRELL MARSHALL LAW GROUP PLLC


By:   /s/ Beth E. Terrell
       Beth E. Terrell, CSB #178181
       Email: bterrell@terrellmarshall.com
       936 North 34th Street, Suite 300
       Seattle, Washington 98103-8869
       Telephone: (206) 816-6603

       *Attorneys for Plaintiffs-Appellees*